Arthur J. FARMER, Plaintiff,

v.

Ray MABUS, as Governor of the State of Mississippi, Defendant.

No. J90–0206(B).

United States District Court,
S.D. Mississippi,
Jackson Division.

March 6, 1991.

Dennis L. Horn, Shirley Payne, Horn and Payne, Jackson, Miss., for plaintiff.

Stephen J. Kirchmayr, Office of Atty. Gen., Jackson, Miss., for defendant.

## MEMORANDUM OPINION AND ORDER

BARBOUR, Chief Judge.

This cause is before the Court, pursuant to Rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure, on the Motion of Defendant, Governor Ray Mabus, for Summary Judgment, or in the Alternative, to Dismiss for failure to state a claim upon which relief can be granted. Plaintiff, Arthur J. Farmer, has filed a Cross–Motion for Summary Judgment. Both parties have responded to the Motions. In addition to the responses and memoranda of authorities submitted in connection with the instant Motions, the Court has also considered evidence submitted at previous hearings in this matter as well as stipulations that have been entered in the record of this case. Both parties have agreed that the case should be decided on the Cross–Motions for Summary Judgment without further evidentiary hearings. On that basis, the Court now renders the following findings of fact and conclusions of law.

## I. FACTS AND PROCEDURAL HISTORY

Upon his assumption of the governorship of the State of Mississippi in 1988, Defendant Ray Mabus duly appointed, and the Mississippi Senate confirmed, Plaintiff Arthur J. Farmer to serve as the adjutant general of the National Guard for the State of Mississippi. As adjutant general, Farmer was designated the executive head of the state military department and was subordinate only to the governor, as commander in chief, in matters pertaining thereto. The adjutant general is vested with certain duties and authority relating to the National Guard pursuant to both state and federal law.

In January of 1990, the news media in Mississippi published several stories concerning Farmer's purchase of a partial ownership interest in property adjacent to the north gate of Camp Shelby, a National Guard training camp that is located in Forrest County, Mississippi. According to the media accounts, a possible expansion of Camp Shelby was under consideration at the time that the land purchase by Farmer and two other National Guard members was made. Following the publication of these news accounts, Mabus issued a written reprimand to Farmer concerning the purchase of the property and directed Farmer to immediately divest himself of any interest in such property. Mabus additionally informed Farmer that a request had been forwarded to the Mississippi Ethics Commission to thoroughly investigate this matter. Following his receipt of Mabus' letter, Farmer divested himself of his interest in the property.

On February 9, 1990, Mabus issued a written directive to Farmer that stated:

In light of recent developments, I have determined that it is both necessary and appropriate for me to exercise my responsibilities as Commander–in–Chief of the Military Department of the State of Mississippi by assuming direct control over the day-to-day operations of the Department. To that end, I have today directed Brigadier General Denver Brackeen to assume an added duty as my

Special Advisor for Military Affairs. As such, General Brackeen will be responsible for advising me with respect to all aspects of the functioning of the Military Department of the State of Mississippi. Thus, I have assumed direct operational control of the Mississippi National Guard. My advisor and representative is General Brackeen.

I am hereby directing you, on a daily basis, to coordinate all aspects of your current duties as Adjutant General through my office, including but not limited to those responsibilities of the Adjutant General set out in section 33-3-11, Mississippi Code of 1972. I also hereby direct you to submit a report to my office each Thursday afternoon, setting out your proposed activities as Adjutant General for the following week. However, you are not to undertake any of those activities until you receive written approval from me. In addition, each Monday morning you are to submit a report to my office, accounting for the previous week. These reports are in addition to the day-to-day coordination with my office referenced above.

On February 12, 1990, Lieutenant General John B. Conaway, Chief of the National Guard Bureau, an auxiliary of the Departments of the Army and the Air Force that is directed to oversee compliance with federal National Guard regulations, issued a memorandum concerning the Mississippi National Guard, wherein he stated:

Enclosed is a letter from Governor Ray Mabus of Mississippi indicating that he intends to assume direct operational control over the Military Department of the State of Mississippi, and that his advisor and representative in that regard will be Brigadier General Denver Brackeen. This has been accomplished.

Governor Mabus has asked that the National Guard Bureau work directly with his office on National Guard matters.

This action is within the authority of the Governor, as Commander-in-Chief of the Mississippi National Guard.

Thereafter, on March 5, 1990, Mabus ordered Farmer to delegate to General Brackeen "all of your authority under 32 USC 708 with respect to technician matters and authority to sign documents concerning such matters.... In addition, I order you to designate Brigadier General Brackeen as your representative to provide the briefing required by [certain National Guard regulations]." The governor conferred with the National Guard Bureau prior to issuing this order, and the National Guard Bureau not only approved of this action, but also forwarded to the governor suggested drafts for the order. By letter dated March 13, 1990, Farmer complied with Mabus' order and delegated all of the requested duties to General Brackeen. Farmer specifically provided in his letter of delegation that "[t]his delegation of authority shall remain effective until specifically revoked in writing by me."[1] Following this exchange of letters, Mabus then ordered Farmer to vacate his office located at the Military Department and report for work at the Mississippi Emergency Management Agency, which was located in a separate state office building. In addition, Farmer was instructed to terminate all flight duties and to return the state automobile he had used in connection with National Guard activities.

On April 19, 1990, Farmer attempted to reassert his authority as adjutant general over the Mississippi National Guard. On that date, Farmer issued the following statement:

This is to inform all concerned that on 19 April 1990, I, Major General Arthur J. Farmer, am reasserting my authority as The Adjutant General, Mississippi National Guard.... Based on [the advice of independent legal counsel], it is obvi-

---

1. In the original March 13, 1990, letter that Farmer sent in response to Mabus' orders to delegate certain of his duties, Farmer delegated his duties pursuant to 32 U.S.C. § 709. However, Mabus' order had called for the delegation of duties Farmer held pursuant to 32 U.S.C. § 708. On April 6, 1990, Farmer revoked the original delegation of duties that had been made

in the March 13, 1990, letter and issued a new delegation of duties to General Brackeen that correctly delegated the duties held under 32 U.S.C. § 708. Farmer again provided in the April 6, 1990, letter that the delegation of authority would remain in effect until specifically revoked in writing.

ous to me that because of the responsibilities incumbent upon me as Adjutant General, I should either reassert my authority or resign. Because of my love for the Mississippi National Guard and my respect for the Mississippi Senate, which confirmed me and invested me with the authority as Adjutant General, I have chosen to reassert my full authority and to perform all my duties as Adjutant General of the State of Mississippi.

To allow someone else to perform my duties while I remain legally responsible for those actions under both State and Federal law jeopardizes both the integrity of Federal funding for the Mississippi National Guard and my position as Adjutant General.

I am revoking any prior delegations of authority made by me, and I will perform the duties and obligations imposed upon me by State and Federal law. Not to reassert my authority as Adjutant General would be in dereliction of these duties.

On that date Farmer also attempted to move his office back to the Military Department. However, Farmer was ordered to vacate the premises by Lieutenant Governor Brad Dye, acting on behalf of Mabus who was out of the state at that time. When Farmer refused to vacate the building, he was escorted from the premises by members of the Mississippi Highway Patrol. It is asserted that subsequent to the events of April 16, 1990, Farmer gave direct orders to Brigadier General Brackeen to cease operating as the officer in charge of the Mississippi National Guard and that General Brackeen refused to obey the direct orders of Farmer.

On May 1, 1990, Farmer filed the instant lawsuit. In his complaint, Farmer asserts that Mabus has stripped him of his authority as adjutant general to direct the day-to-day operations of the Mississippi National Guard. Such acts, Farmer contends, are tantamount to his removal from office. Since Mabus has failed to remove the adjutant general from office in the manner prescribed by Mississippi law, Farmer asserts that he has been deprived of the property interest he holds in his position as adjutant general of the Mississippi National Guard without due process of law as

guaranteed by the Mississippi Constitution and the fourteenth amendment to the United States Constitution. Further, Farmer contends that Mabus' orders directing him to delegate certain of his duties as adjutant general are in violation of both state and federal statutes and regulations that require those duties to be carried out by the duly appointed adjutant general of the Mississippi National Guard. In the complaint, Farmer asks this Court to issue a declaratory judgment that the adjutant general, until he is removed from office in a manner prescribed by law, possesses the authority and duty under applicable federal and state law to oversee the day-to-day operations and all specific operations of the Mississippi National Guard. Farmer further prays for the issuance by the Court of an injunction directing Mabus not to impede Farmer's performance of his duties. Shortly after the filing of the complaint, Farmer filed a Motion for Preliminary Injunction seeking to have this Court enjoin Mabus' interference with Farmer's supervision of the Mississippi National Guard. Mabus responded to the Motion for Preliminary Injunction and also filed a Cross–Motion for Summary Judgment, or in the Alternative, to Dismiss.

Subsequent to the filing of this lawsuit, "charges and specifications" were lodged against Farmer pursuant to provisions of the Mississippi Code of Military Justice that provide for the institution of court martial proceedings against members of the Mississippi National Guard. On June 15, 1990, Farmer was formally suspended with pay from his position as adjutant general. On that same date, Mabus filed a Motion to Hold in Abeyance, seeking to have this Court suspend any action in the instant lawsuit pending resolution of the military proceedings that had been instituted against Farmer. Both Mabus' Motion to Hold in Abeyance and Farmer's Motion for Preliminary Injunction were denied by this Court. Thereafter, Farmer filed a Motion for Summary Judgment.

The military investigation of the charges and specifications that had been lodged against Farmer concluded that a court martial proceeding was justified on the charge

that Farmer had created a conflict of interest by participating in the land purchase. On the basis of the findings of the military investigation, Mabus thereafter ordered Farmer to stand trial by a court martial for his involvement in the land deal.

Once court martial proceedings had been instigated against Farmer, he filed with this Court a Motion to Enjoin the Court Martial Proceeding. By Order of this Court entered October 31, 1990, Farmer's Motion to Enjoin the Court Martial Proceedings was denied. Shortly thereafter, the court martial proceeding was dismissed by the presiding military judge on the basis that Mabus had exerted improper command influence over the instigation of the court martial proceeding. In its findings, the military court concluded that there was sufficient evidence to indicate that the court martial proceeding had been instituted in reaction to Farmer's filing of the instant case in federal court. Prosecutors in the court martial proceeding subsequently appealed the findings of the military court to the Mississippi Court of Military Appeals. While that appeal is pending, Farmer remains on suspension with pay from his position as adjutant general.

## II. CONCLUSIONS OF LAW

Rule 56 of the Federal Rules of Civil Procedure states in relevant part that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). The United States Supreme Court has held that this language "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Moreover, the party moving for summary judgment bears the responsibility of informing the district court of the basis for its motion, and identifying those portions of the record in the case which it believes demonstrates the absence of a genuine issue of fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53.

Summary judgment can be granted only if everything in the record demonstrates that no genuine issue of material fact exists. The district court, therefore, must not "resolve factual disputes by weighing conflicting evidence, ... since it is the province of the jury to assess the probative value of the evidence." *Kennett–Murray Corp. v. Bone,* 622 F.2d 887, 892 (5th Cir. 1980). Summary judgment is improper merely where the court believes it unlikely that the opposing party will prevail at trial. *National Screen Service Corp. v. Poster Exchange, Inc.,* 305 F.2d 647, 651 (5th Cir. 1962).

Five primary issues of law are presented by the Motions for Summary Judgment presently before the Court:

(1) whether Farmer's claims present legal issues that are justiciable before this Court;

(2) whether Farmer has standing to raise the claims that he has asserted;

(3) whether Farmer has a property interest in his position as adjutant general that is protected by the due process clause of the fourteenth amendment to the United States Constitution and the due process clause of the Mississippi Constitution, so that delegation of Farmer's authority as adjutant general without the observation of certain procedural protections constitutes a deprivation of due process of law;

(4) whether Mabus has divested Farmer of his authority as adjutant general that is derived from certain state statutes so that the failure to remove Farmer from office in compliance with Mississippi law constitutes a violation of state law; and

(5) whether Mabus has divested Farmer of his federally derived authority as adjutant general in violation of the United States Constitution as well as certain federal statutes and regulations.

Both parties agree, and the Court so finds, that no genuine issues of material fact exist as to any of the claims asserted

in Plaintiff's complaint and that all issues of law can be determined by the Court on the summary judgment motions presently under consideration without further evidentiary hearings.

A. Structure of the National Guard

Before addressing the particular legal issues raised by this matter, the Court feels that a brief explanation of the operational structure of the Mississippi National Guard is instructive.

A state militia is expressly provided for in the United States Constitution. *See* U.S. Const. amend. II. Thus, each state is empowered to maintain and, indeed, does maintain a state militia, the modern counterpart which we know as the National Guard ("State Guard").

In 1933, Congress provided for the merging of state militia and federal military forces by making the State Guard a permanent part of the federal military system. Under the "dual-enlistment" concept, State Guard organizations were made reserve components of the United States Army and Air Force. In their federal capacities, these State Guard units are the National Guard of the United States. The 1933 Act created an enlistment system whereby "an incoming guardsman joined both the National Guard of his home state and the National Guard of the United States." *Johnson v. Powell*, 414 F.2d 1060, 1063 (5th Cir.1969). Thus, every Guardsman serves as both a reservist in the federal military and a militiaman is the state military. *Dukakis v. United States Dept. of Defense*, 686 F.Supp. 30, 34 (D.C.Mass.), *aff'd* 859 F.2d 1066 (1st Cir.1988) (quoting Weiner, *The Militia Clause of the Constitution*, 54 Harv.L.Rev. 181, 208 (1940)).

Because of the National Guard's uniquely dualistic role within our system of feder-al government, it has its constitutional roots not only in the right of states to raise and maintain a militia, but also in Congress' authority to raise and support armies, *see* U.S. Const. art. I, § 8, cl. 16, and the President's power to oversee federal military forces as commander in chief. *See* U.S. Const. art. II, § 2. Pursuant to its constitutional authority, Congress has enacted legislation for equipping, training, and disciplining National Guard units. Congress has also created the National Guard Bureau, an auxiliary of the Department of the Army and Air Force, to oversee National Guard units and to ensure compliance with federal statutes and regulations. 10 U.S.C. § 3040. National Guard units that fail to comply with federal standards are subject to forfeiture of federal funds and other benefits. 32 U.S.C. § 108.

Federal regulation of National Guard units requires each state to have an adjutant general who "shall perform the duties prescribed by the laws of that jurisdiction." 32 U.S.C. § 314(a). Federal law also specifies certain federal duties that must be performed by the adjutant general in addition to those duties imposed upon him under state law. *See* 32 U.S.C. § 314(c) (requiring adjutant general to make reports and returns to Secretaries of the Army and Air Force); 32 U.S.C. § 709(c) (authorizing adjutant general to employ and administer technicians); 32 U.S.C. § 322(c) (requiring adjutant general to administer and discharge enlisted men in the National Guard); 32 U.S.C. § 324(b) (requiring adjutant general to supervise National Guard officers as prescribed by state law). Additional federal duties of the adjutant general are set forth by United States National Guard Regulations and cover at least thirty-nine areas of supervision and oversight.[2]

---

**2.** For examples of United States National Guard Regulations ("NGR") that specifically set out the duties and authority of the adjutant general *see* NGR 10–1 (federal recognition of Army National Guard Units); NGR 10–2 (STARC headquarters responsibilities); NGR 11–27 (Army National Guard Energy Program); NGR 58–1 (administration/operation of administrative use vehicles); NGR 95–1, MARNG Supplement 1 (aviation); NGR 130–6 (appointment of United States Property and Fiscal Officers); NGR 190–11 (physical security); NGR 230–65 (unit funds); NGR 310–10 (orders); NGR 335–10 (control of reports); NGR 351–3 (NCO education system); NGR 351–5 (authorization for Mississippi Military Academy); NGR 385–5 (accident prevention); NGR 385–10 (safety and health); NGR 385–11 (radiation safety); NGR 600–2 (premobilization screening of ARNG personnel); NGR 600–5 (active guard/reserve program); NGR 600–6 (selection, training, and assignment of FTRF); NGR 600–7 (managing active army personnel); NGR 600–12 (army national guard family program).

State law also defines the role that the adjutant general is to play in directing the National Guard. By provision of the Mississippi Constitution, the governor serves as the commander in chief of the state militia, the Mississippi National Guard. Miss. Const. art. 9, § 217. The Mississippi law also provides that the governor is to appoint an adjutant general, Miss. Const. art. 9, § 219, who "shall be the executive head of the [military] department [of the State of Mississippi] and, as such, subordinate only to the governor in matters pertaining thereto." Miss.Code Ann. § 33–3–3 (1972). The governor's appointment of an adjutant general must be confirmed by the Mississippi Senate. Miss. Const. art. 9, § 216; *see also* Miss.Code Ann. § 33–3–7 (1972). The adjutant general's term of appointment is co-extensive with the governor's term of office, Miss. Const. art. 9, § 219, and he may be removed from office only upon his own request, by a decision of a court martial proceeding, or upon the recommendation of the governor and a vote of two-thirds of the Mississippi Senate. Miss. Const., art. 9, § 216.

As a matter of state law, the adjutant general has certain specified powers and duties. Pursuant to these statutory provisions, the adjutant general must appoint all employees of the Mississippi Military Department; keep and maintain all records, papers, and reports required of the military department by both state and federal regulations; issue commissions to military officers; and attend and issue all military property. Miss.Code Ann. § 33–3–1 (1972). Among other powers, the adjutant general is also authorized to issue, with the approval of the governor, such orders, rules, and regulations as may be necessary for the proper training and discipline of National Guard forces. Miss.Code Ann. § 33–3–15 (1972).

### B. Analysis of Claims

Plaintiff asserts that he holds a property interest in his position as adjutant general of the Mississippi National Guard and in the authority that the position confers upon him pursuant to state and federal law. Plaintiff contends that Defendant has effectively removed him from his position as adjutant general without the observation of the specific legal procedures which state law requires to remove the adjutant general from office, and that, accordingly, he has been deprived of his property interest in his position and command authority as adjutant general without due process of law as guaranteed by the Mississippi Constitution and the fourteenth amendment to the United States Constitution. Plaintiff further alleges that, because he has been improperly deprived of his authority as adjutant general, Defendant is in violation of state and federal statutes and regulations that require the duly appointed adjutant general to exercise certain powers with regard to the National Guard. Defendant contests the claims asserted by Plaintiff and also raises justiciability and standing as bars to Plaintiff's suit.

### (1) Justiciability

A primary argument advanced by Defendant in this matter is that this lawsuit concerns a military personnel matter and, as such, should not be heard by this Court on the basis of justiciability concerns. In addition, Defendant asserts that the state law claims asserted by Plaintiff are barred by the eleventh amendment to the United States Constitution and principles of state sovereignty.

### (a) deference to military decision-making

The primary concern in determining the justiciability of claims asserted by servicemen against the military and their commanding officers has historically been the degree to which judicial action would interfere with military functions. As the United States Supreme Court recognized in *Orloff v. Willoughby*, 345 U.S. 83, 93–94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953):

> We know that from top to bottom of the Army the complaint is often made, and sometimes with justification, that there is discrimination, favoritism or other objectionable handling of men. But judges are not given the task of running the Army. The responsibility for setting up channels through which such grievances can be considered and fairly settled rests upon the Congress and upon the Presi-

dent of the United States and his subordinates.... Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters. While the courts have found occasion to determine whether one has been lawfully inducted and is therefore within the jurisdiction of the Army and subject to its orders, we have found no case where this Court has assumed to revise duty orders as to one lawfully in the service.

In *Chappell v. Wallace*, 462 U.S. 296, 305, 103 S.Ct. 2362, 2368, 76 L.Ed.2d 586 (1983), the Court reiterated its position that judicial action must not proceed at the expense of military authority and discipline.

The special relationships that define military life have supported the military establishment's broad power to deal with its own personnel. The most obvious reason is that Courts are ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have.

It is this view of the proper spheres of judicial and military decision-making that has tempered judicial consideration of the justiciability of various types of claims lodged against the military. In *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), the Court determined that personal injury claims asserted by servicemen in which monetary damages were sought did not present justiciable issues where the injury arose from or in the course of activities that were incident to military service. *Feres*, 340 U.S. at 146, 71 S.Ct. at 159. Likewise, in *Chappell v. Wallace*, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983), the Court held that military personnel could not maintain suits for alleged constitutional violations by superior officers where a monetary recovery was sought. *Chappell*, 462 U.S. at 305, 103 S.Ct. at 2368. Both the *Feres* and *Chappell* courts cited interference with the military function and the availability of alternative intraservice remedies as bases for denying judicial action in these circumstances. *See Chappell*, 462 U.S. at 299–300, 103 S.Ct. at 2365–66; *Feres*, 340 U.S. at 144, 71 S.Ct. at 158.

The central justiciability issue presented by the instant case, that is the availability of judicial review where injunctive relief, as opposed to monetary damages, is sought for alleged constitutional violations, was addressed by the court in *Crawford v. Texas Army National Guard*, 794 F.2d 1034 (5th Cir.1986). While noting that neither *Feres* nor *Chappell* directly addressed the issue of injunctive relief, the *Crawford* court recognized that those decision indicated that "[t]here can be little doubt that the permissible range of lawsuits by present and former servicemen against their superior officers is, at the very least, narrowly circumscribed." *Crawford*, 794 F.2d at 1035. The court then concluded that the justiciability of lawsuits involving military matters was not dependent upon the nature of relief sought, but rather upon the nature of the lawsuit itself. *Id.* at 1036. Where the claims asserted in a lawsuit were such that resolution of the suit would invite judicial second-guessing of military actions and would tend to overlap remedial structures that already existed within the military structure itself, the judicial deference exhibited in *Feres* and of *Chappell* should prevail. *Id.* On this basis, the *Crawford* court concluded that lawsuits involving military matters were proper subjects of judicial action only where "they involve challenges to the facial validity of military regulations and [are] not tied to discrete personnel matters." *Id.*

Defendant asserts that this Court must dismiss Plaintiff's suit because it involves military personnel issues that are non-justiciable under the holding of *Crawford*. This lawsuit, Defendant contends, clearly challenges a military personnel matter, i.e., the orders given by the governor as commander in chief to the adjutant general. Defendant contends that, because this lawsuit would require the Court to directly consider the application of certain military regulations to a specific personnel decision, this Court must refrain from considering Plaintiff's claims. Conversely, Plaintiff contends that the instant suit is not barred by the *Crawford* decision. Because this suit seeks judicial review of the constitutional limitations placed upon the authority

of a commander in chief to assume direct operational control of the National Guard without removing the adjutant general from office as required by law, and because this suit only requires the Court to consider whether relevant constitutional principles support Defendant's contention that he has legal authority to act in the manner that he has, Plaintiff contends that this Court is not *Crawford* bound to dismiss the action as non-justiciable because the Court will not be required in any way to consider the actual merits of any discretionary personnel decision Defendant made while acting on the presumption that he had the authority to undertake the actions in dispute.

■ Upon examination of *Crawford* as well as other relevant legal authority, the Court concludes that the instant suit presents issues of law that are fully justiciable in this forum. While this Court is fully aware of the clear directive on the justiciability of military matters that has been laid down in *Crawford*, the Court concludes that, unlike the issues presented in that decision, the instant case does not present issues that are capable of being broken down neatly into the categories of challenges to the facial validity of military regulations and challenges to personnel matters. Upon examination of the reasoning expressed in *Crawford* to distinguish these two types of actions, however, this Court finds that the instant case does not involve the type of objectionable judicial inquiry that attends consideration of traditional military personnel matters. As the Court has previously noted, Plaintiff's suit challenges whether an exercise of authority by Defendant could occur under the circumstances presented, not whether the actual decision that was made while exercising that authority was in fact a wise one. The question of Defendant's authority in this matter is one of constitutional proportion and, as such, is properly before this Court. As the United States Supreme Court recognized in *Harmon v. Brucker*, 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958), the issue of whether a military official has exceeded his express or implied powers is judicially cognizable before a federal court. *Harmon*, 355 U.S. at 582, 78

S.Ct. at 435. Accordingly, the Court finds that the claims asserted by Plaintiff are predominately constitutional in nature and, as such, do not present discrete personnel matters which should not be heard by this Court.

Upon further review of the record in this case, the Court finds additional evidence to support its conclusion that the instant matter does not present the type of military personnel matter for which judicial review has traditionally been considered objectionable. As this Court notes, *infra*, Defendant has been able to cite no provision of state law which expressly grants him the authority to assume direct control of a personnel matter as has he has purportedly done in the instant matter. Nor has Defendant been able to provide this Court with any statutory authorization for the particular personnel decision that was made in this instance. Without some legal basis for Defendant's exercise of personnel decision-making authority in this case, the Court is hard pressed to conclude that Defendant's actions can be in fact characterized as personnel matters. Indeed, the record is replete with circumstances that indicate that political considerations, rather than personnel concerns, have been the motivating factor in Defendant's conduct. This Court is unwilling to fashion a rule of law which would allow political maneuvering that affects constitutional concerns to go unanswered in court merely because such activity has been termed a personnel matter by those guilty of such conduct. Accordingly, the Court finds that Plaintiff's suit is not barred by justiciability concerns on that basis.

■ The Court is persuaded of the justiciability of this matter upon consideration of other factors cited in the *Crawford* decision as well. *Crawford* and its predecessors have consistently cited the availability of intraservice remedies that ultimately provide for judicial review at later stages in the process, as a basis for denying judicial intervention in such matters. The facts of the instant case, however, do not support a finding that Plaintiff would have any effective intraservice remedy available to him if

the Court refuses to hear this lawsuit. Though Defendant has not cited this Court to any intraservice remedy that Plaintiff should have resorted to as an alternative to this action, the Court concludes that the Mississippi Code of Military Justice does provide intramilitary grievance procedures that could have been utilized by Plaintiff.

> Any member of the state military forces who believes himself wronged by his commanding officer and who, upon due application to that commanding officer, is refused redress, may complain to any superior commissioned officer, who shall examine into the complaint and take proper measures for redressing the wrong complained of.

Miss.Code Ann. § 33–13–605 (1972). The Court notes that Plaintiff has not availed himself of this statutory remedy. However, the Court does not conclude that the mere availability of an unexhausted intraservice remedy requires the Court to dismiss Plaintiff's suit. Rather, the Court concludes that the availability of an intraservice remedy may have no effect on the justiciability of Plaintiff's claim where it can be demonstrated that resort to that remedy would have been futile or where no real possibility of adequate relief exists by means of the unexhausted remedy. *See Committee for GI Rights v. Callaway*, 518 F.2d 466, 474 n. 20 (D.C.Cir.1975); *Hodges v. Callaway*, 499 F.2d 417, 420–21 (5th Cir.1974). On this basis, the Court concludes that Plaintiffs failure to exhaust the intraservice remedy provided by Miss.Code Ann. § 33–13–605 is not fatal to his federal suit since resort to that procedure, in light of the record in this case, would produce no real possibility of adequate relief for Plaintiff's grievances. The procedure provided for by section 33–13–605 would require Plaintiff to apply to his commanding officer, Defendant in this instance, for redress of his grievances. If redress of Plaintiff's claims was refused, Plaintiff would then be required to make a further complaint "to any superior officer" who, under the peculiar facts of this case, could only be Defendant. Because the process could only result in Plaintiff applying to Defendant for a redress of his grievances, and because the record of this case clearly demonstrates

that Defendant would not give impartial consideration to a challenge to his authority by Plaintiff, the Court concludes that Plaintiff's suit is justiciable despite Plaintiff's failure to exhaust the intraservice remedy that were available to him.

Lastly, the Court notes a final factor that has often been cited as a basis for rejecting judicial intervention in military matters, namely that such matters involve considerations that are particularly within military as opposed to judicial, expertise. The Court finds that no such concerns are present in the instant matter. Plaintiff's claims do not require the Court to review in any way the substantive wisdom of any particular military judgment that Defendant has made. Rather, this Court only concerns itself with constitutional limitations that may be placed on Defendant's ability to assume operational control of the National Guard in the particular manner he has chosen. Purely legal issues, particularly those that involve constitutional limitations on military authority and the manner in which that authority can be exercised, fall within the "expertise" of this Court and are ones which this Court is competent to address. Accordingly, the Court concludes that Plaintiff's claims should not be dismissed as non-justiciable. As has been noted with regard to Article III courts and their responsibility to protect the constitutional rights of all citizens,

> It is the function of the Courts to make sure ... that the men and women constituting our Armed Forces are treated as honored members of society whose rights do not turn on the charity of a military commander.... A member of the Armed Forces is entitled to equal justice under law not as conceived by the generosity of a commander but as written in the Constitution and engrossed by Congress in our public law.

*Winters v. United States*, 89 S.Ct. 57, 59–60, 21 L.Ed.2d 80 (Douglas, Circuit Justice 1969).

### (b) sovereign immunity

In addition to claims of non-justiciability on the basis of military deference, Defendant also asserts that this Court should

decline to hear all state law claims raised in this lawsuit on the basis of the eleventh amendment to the United States Constitution and principles of sovereign immunity.

The eleventh amendment to the United States Constitution provides that

[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. In *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), the Court held that, despite the express language of the eleventh amendment itself, federal courts were barred by that provision from considering a suit brought by a citizen against his own state.

■ Defendant asserts that, concomitant with the eleventh amendment, principles of sovereign immunity, and the decision in *Pennhurst State School & Hospital v. Haldermen (Pennhurst II)*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), this Court is barred from considering Plaintiff's state law claims. In *Pennhurst II*, the Court considered whether a federal suit alleging that state officials have violated state law in carrying out their official duties was barred by the eleventh amendment. The Court held that, where the alleged violation of law which is to be remedied is strictly a violation of state law and no federal statutes or constitutional provisions have been implicated, a federal suit against state officials is barred by the eleventh amendment and principles of sovereign immunity. *Pennhurst II*, 465 U.S. at 117, 104 S.Ct. at 917. Consequently, this Court concludes that, to the extent that Plaintiff seeks redress purely on the basis of a violation of state law by Defendant, Plaintiff's claims are barred by the eleventh amendment and this Court cannot issue any relief, injunctive or otherwise, with regard to those claims of the complaint.

■ The Court notes, however, that this finding does not bar Plaintiff's suit completely, nor does it remove all issues of state law from this lawsuit. In addition to his claim that Defendant has violated state law, Plaintiff also asserts that he has been deprived of a property interest in his authority as adjutant general in violation of the due process clause of the fourteenth amendment to the United States Constitution. This Court initially notes that, with regard to the property interest of which Plaintiff has allegedly been deprived, state law can serve to define whether such a property interest does exist and, if so, the substance of any property interest so found. *See Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) (holding that a property right is established by showing that a "legitimate claim to entitlement" exists under state law). The Court therefore concludes that, to the extent that resort to state law is necessary to define the alleged property interest at issue in this lawsuit, state law remains a vital part of this Court's decision and does not, when restricted to this consideration alone, fall within the confines of the *Pennhurst II* decision. Consequently, the eleventh amendment does not bar resolution of the due process claims asserted by Plaintiff.

■ The Court next considers whether the eleventh amendment bars the due process claim on the basis that it represents a suit against a state official. The Court notes that a suit challenging the constitutionality of a state official's actions is not a suit against the State within the meaning of the eleventh amendment and, therefore, is not barred by sovereign immunity. *Ex parte Young*, 209 U.S. 123, 160, 28 S.Ct. 441, 454, 52 L.Ed. 714 (1908). This result obtains with regard to all challenges to the constitutionality of official conduct, regardless of whether the constitutionality of the state statute under which the state official purported to act is challenged itself. *Greene v. Louisville & I.R. Co.*, 244 U.S. 499, 507, 37 S.Ct. 673, 677, 61 L.Ed. 1280 (1917).

The Court is cognizant of the anomaly that the *Young* exception to sovereign immunity appears to create when it is applied to suits such as the instant matter where a violation of due process is asserted. In essence, *Young* stands for the proposition that an official's allegedly unconstitutional

conduct does not constitute state action for purposes of the sovereign immunity issue, but does constitute state action for purposes of asserting a fourteenth amendment claim. *Florida Department of State v. Treasure Salvors, Inc.,* 458 U.S. 670, 685, 102 S.Ct. 3304, 3314–15, 73 L.Ed.2d 1057 (1982). However, this result is necessary to ensure that federal courts maintain their ability to vindicate federal rights and require state officials to conform their conduct to "the supreme authority of the United States." *Young,* 209 U.S. at 160, 28 S.Ct. at 454.

Accordingly, this Court concludes that the eleventh amendment and principles of sovereign immunity do not bar consideration of Plaintiff's due process claims. This result is proper even though state law must be consulted in determining whether a property interest does in fact exist and despite the fact that the conduct of a state official is at issue.

### (2) Standing

Defendant next asserts that Plaintiff lacks standing to assert claims based upon an alleged violation by Defendant of certain federal statutes and regulations pertaining to the authority and duties of the adjutant general. In support of this contention, Defendant notes that Plaintiff, in his present status as a member of the Mississippi National Guard, cannot be court martialed under the United States Uniform Code of Military Justice and can only be discharged from his duties "as provided by the laws of the State [of Mississippi]." *See* 32 U.S.C. § 324(b). In addition, Defendant notes that the only action that federal authorities could take in the event that federal requirements concerning the operation of the Mississippi National Guard are violated would be to bar, in whole or in part, all federal funds and benefits received by the Mississippi National Guard. *See* 32 U.S.C. § 108. On that basis, Defendant contends that Plaintiff is not able to establish any personal injury-in-fact that he has sustained as a result of Defendant's orders prohibiting him to undertake or carry out certain federal statutory or regulatory duties. Since the only entity that could be injured by failing to follow the federal requirements would be the Mississippi National Guard, Defendant asserts that Plaintiff has failed to establish standing to raise claims based on those federal statutes and regulations.

 As the United States Supreme Court has recently reiterated, standing "is perhaps the most important of the jurisdictional doctrines," thus placing federal courts under a special obligation to determine that standing exists in all controversies placed before them. *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 110 S.Ct. 596, 607, 107 L.Ed.2d 603 (1990) (citing *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)). In order to establish standing to raise a claim, a plaintiff must demonstrate that (1) he has personally suffered or will suffer some distinct injury-in-fact as a result of defendant's putatively illegal conduct; (2) the injury can be traced with some degree of causal certainty to defendant's conduct; (3) the injury is likely to be redressed by the requested relief; (4) the plaintiff must assert his own legal rights and interests, not those of a third party; (5) the injury must consist of more than a generalized grievance that is shared by many; and (6) the plaintiff's complaint must fall within the zone of interests to be regulated or protected by the rule of law in question. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471–77, 102 S.Ct. 752, 757–61, 70 L.Ed.2d 700 (1982); *see also Allen v. Wright,* 468 U.S. 737, 751–52, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984). Moreover, where injunctive relief is sought, a plaintiff must establish the he personally faces a realistic, immediate, and non-speculative threat of being prospectively subjected to or harmed by the particular conduct at issue. *City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983). Mere proof of injury that is a result of past conduct is not sufficient. *Lyons,* 461 U.S. at 102, 103 S.Ct. at 1665.

 The Court finds that Plaintiff has demonstrated standing to challenge the alleged violation of federal statutes and regulations pertaining to the office of adjutant

general. Defendant's argument that Plaintiff has no standing to raise these claims is largely premised upon the fact that the only punitive damage that could be taken by federal authorities upon a violation of federal law would be against the Mississippi National Guard and not against Plaintiff himself. Upon examination of relevant legal authority, however, the Court rejects this argument on two bases.

The ability of federal authorities to withdraw federal funds from the Mississippi National Guard for violations of federal law does not constitute an absolute bar to Plaintiff's standing to challenge those same violations of federal law. As the United States Supreme Court has observed, a withdrawal of federal funds is a severe and often clumsy remedy to address isolated incidents of non-compliance with federal statutes. *Cf., Cannon v. University of Chicago*, 441 U.S. 677, 703–04, 99 S.Ct. 1946, 1961, 60 L.Ed.2d 560 (1979). Since federal law imposes no restrictions on federal funding of the National Guard, and funding decisions may be made with total discretion, *see MacFarlane v. Grasso*, 696 F.2d 217, 226 (2nd Cir.1982), this Court is persuaded that provisions allowing for the cut-off of federal funds were not intended to serve as the sole method of redressing violations of federal statutes regulating National Guard activities. As the Court in *Wright v. City of Roanoke Redevelopment & Housing Authority*, 479 U.S. 418, 428, 107 S.Ct. 766, 773, 93 L.Ed.2d 781 (1987) noted, a federal agency's discretionary powers to curtail federal funding are insufficient to indicate the foreclosure of all other remedies for violations of applicable federal statutes and regulations. Accordingly, this Court finds that provisions allowing for the curtailment of federal funds to the Mississippi National Guard which could be used in the event of violations of federal requirements do not constitute an absolute bar to other remedies for violation of those same federal requirements and cannot support a conclusion that standing should be denied to Plaintiff on this basis.

■ The Court also finds Defendant's contention that Plaintiff has no standing to assert federal statutory and regulatory claims because federal authorities could take no direct punitive action against Plaintiff to be without merit. Because Plaintiff could not be court-martialed or otherwise removed from office pursuant to federal law, Defendant contends that Plaintiff has suffered no injury-in-fact as a result of the alleged violations of federal law. This Court notes, however, that the alleged violations of federal law, if established, would clearly result in damage to Plaintiff's position of command as well as his personal honor in carrying out those command duties. The standing of a military officer to raise damage to his honor as a cognizable injury has long been recognized. *See, e.g., Case of Davis*, 7 F.Cas. 63, 97 (C.C.D. Va.1867). The United States Supreme Court has recently restated its position that non-financial interests in one's employment can confer standing to challenge conduct that impedes those non-financial career interests. *See Rutan v. Republican Party of Illinois*, — U.S. —, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). As the *Rutan* court noted, constitutional protection exists for public employees to such an extent that they have been found to have standing to challenge "act[s] of retaliation as trivial as failing to hold a birthday party for a public employee." *Rutan*, 110 S.Ct. at 2737 n. 8. Consequently, there are injuries to career interest less harsh than dismissal that nevertheless grant standing to challenge injurious conduct. *Id.* 110 S.Ct. at 2737. The Court therefore concludes that the lack of federal authority to directly cause Plaintiff's dismissal or to otherwise reprimand him does not prohibit Plaintiff from asserting standing to challenge alleged violations of federal statutes and regulations where Plaintiff has clearly established that such violations, if proved, directly resulted in injury to his honor, his position of command, and his ability to exercise his authority as adjutant general.

### (3) Due Process Claims

Having determined that neither principles of justiciability nor standing prohibit this Court from addressing Plaintiff's claims that Defendant has deprived him of a protected property interest in violation of the due process clause and other relevant

federal statutes and regulations, the Court now considers the merits of Plaintiff's substantive claims.

### (a) property right

In order to establish that Defendant has acted in contravention to the due process clause of the fourteenth amendment to the United States Constitution, Plaintiff must first establish some property right or interest that falls within the protection of that constitutional provision. In order to establish a property right, Plaintiff must demonstrate that, pursuant to state law, he had a "legitimate claim of entitlement" to the position of adjutant general. *See Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

█ Article 9, section 216 of the Mississippi Constitution provides that the adjutant general can be removed from office "by the Senate on suggestion of the Governor, stating the grounds on which the removal is recommended, or by a decision of court-martial pursuant to law, or at his own request." This Court finds that Article 9, section 216 of the Mississippi Constitution creates a "legitimate claim of entitlement" on behalf of Plaintiff to continue in the position of adjutant general until his removal from office is achieved in one of the ways authorized by state law.

It is undisputed that Plaintiff has been suspended with pay from the performance of all duties associated with the office of adjutant general. Defendant, however, contends that this suspension has not resulted in a violation of either substantive or procedural due process as guaranteed to Plaintiff. Because the position of adjutant general does not encompass a right to act independent of the direction, orders, and general command authority of the governor as commander in chief, Defendant contends that Plaintiff has in fact suffered no loss of authority that he has a right to legitimately claim as an attribute of the office of adjutant general. Defendant additionally asserts that, assuming Plaintiff has suffered some deprivation of a property interest, the procedures that have been instituted to suspend Plaintiff from his position with pay conform to the procedural requirements of the due process clause.

The Court will initially consider the nature of the property interest that Plaintiff holds in his position as adjutant general. As noted by the Court in *Board of Regents v. Roth, supra,* property interests "are created and their dimensions are defined by existing rules or regulations that stem from ... state law." *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. In this regard the Court notes that Mississippi law provides that

> [t]here shall be in the executive branch of the state government a military department. The adjutant general shall be the executive head of the department and, as such, subordinate only to the governor in matters pertaining thereto.

Miss.Code Ann. § 33–3–3 (1972). Mississippi law also provides certain general powers and duties the adjutant general is to exercise. *See, e.g.,* Miss.Code Ann. § 33–1–33(2) (authorizing adjutant general to confer peace officer powers upon military personnel); *id.* § 33–3–11 (authorizing adjutant general to appoint employees, maintain military records, issue commissions, and attend military property); *id.* § 33–7–23 (authorizing adjutant general to order inspections); *id.* § 33–7–111 (authorizing adjutant general to dismiss or transfer officers); *id.* § 33–7–113 (authorizing adjutant general to publish a list of officers). Mississippi law expressly provides, however, that some of the authority conferred upon the adjutant general may be exercised only with the approval of the governor. For example, Miss.Code Ann. § 33–3–11(15) (1972) states that the adjutant general shall, with the approval of the governor, provide for the organization, training, tactical employment, and discipline of the Mississippi National Guard. In addition, Miss.Code Ann. § 33–3–15 (1972) provides that the adjutant general shall have the power, with the approval of the governor, to issue such orders, rules, and regulations relating to the organization of the Mississippi National Guard as may be necessary to ensure that training and discipline programs are in compliance with federal requirements.

Defendant asserts that Plaintiff's property interest in his position as adjutant gener-

al is defined not only by state law dealing with the powers and authority of the adjutant general, but also state law dealing with the powers that the governor may exercise as commander in chief and as Plaintiff's superior officer. Mississippi law provides that

> [t]he governor shall be commander in chief of the militia ... except when it is called into the service of the United States, and shall have the power to call forth the militia to execute the laws, repel invasion, and to suppress riots and insurrections, and *to perform such other functions as may be authorized by law.*

Miss.Code Ann. § 33–3–1 (1972) (emphasis added). Mississippi law expressly authorizes the governor, as commander in chief, to exercise certain powers over the state militia.[3] As previously noted, however, state law expressly provides for gubernatorial oversight, review, or approval of the adjutant's general's actions with regard to only certain, specific statutory enactments. *See, e.g.,* Miss.Code Ann. §§ 33–3–11(15) and 33–3–15 (1972) (authorizing adjutant general, with the approval of the governor, to promulgate orders, rules, and regulations concerning with the organization, training, and discipline of the Mississippi National Guard).

This Court concludes that the substance of the property right held by Plaintiff in his position and authority as adjutant general is defined by three distinct categories of statutory enactments. The first category involves those statutes that expressly provide for the adjutant general to exercise certain duties and authority without any mention of oversight or review of these actions by the commander in chief. With regard to this category of statutory empowerment, Plaintiff has established a property interest in the absolute right to exercise such authority without interference from the commander in chief. The second category of statutory enactments includes those statutory provisions that expressly provide for gubernatorial oversight of the adjutant general's activities. With regard to this category of statutory empowerment, Plaintiff has established a property interest in the right to exercise these powers and authority only to the extent that Plaintiff has demonstrated an entitlement to undertake these activities subject to the direction and supervision of the commander in chief. Finally, the third category of statutory enactments include those statutory provisions that expressly provide for the commander in chief to exercise certain duties and authority without any mention of participation by the adjutant general. With regard to this category of statutory enactments, Plaintiff has demonstrated no property interest in the right to exercise or participate in the exercise of these powers and authority.

■ Defendant asserts that Plaintiff's property interest in his powers and authority as adjutant general is not only constrained by the express provisions of statutory enactments, but also by an implied constraint on all exercises of the adjutant general's authority that is inherently present by virtue of Defendant's superior authority as commander in chief. Clearly, Defendant contends, both the statutes concerning the authority of the adjutant general and those dealing with the authority of the commander in chief contemplate that the adjutant general is merely the executive head of the Mississippi National Guard and in all matters pertaining thereto is subordinate to his commander in chief. Defendant asserts that the statutes concerning the duties of the adjutant general clearly contemplate that all activities of the adjutant general are subject to the approval of the governor. Thus, according to Defendant, the adjutant general has at no time had a legitimate claim of absolute entitlement to perform any of his duties

---

**3.** The various actions the governor is authorized to take with regard to the state militia included ordering an enrollment of the state militia (Miss.Code Ann. § 33–5–3), appointing a Board of Exemptions (*id.* § 33–5–7), drafting and ordering into service an unorganized state militia (*id.* § 33–5–9 through –13), organizing and equipping a state guard force (*id.* § 33–5–51 through –53), ordering troops beyond the borders of the state (*id.* § 33–7–7–), appointing and commissioning all officers of the Mississippi National Guard (*id.* § 33–7–101), and ordering the state militia into active duty pursuant to a declaration of martial law (*id.* § 33–7–301 through –303).

without the supervision and approval of the commander in chief of the Mississippi National Guard.

This Court, however, is unable to conclude that Defendant's powers as commander in chief are of such a limitless nature that they inherently deprive Plaintiff of his right to assert a property interest in the authority he has been vested with as adjutant general. Defendant's theory of implied limitations on Plaintiff's authority is necessarily premised on the notion that the inherent powers of the commander in chief to direct and control the operations of the National Guard are without limit under state law. This Court, however, finds that limits do exist and are, indeed, expressly provided for in the same statutory enactments that are the source of the commander in chief's powers. Miss.Code Ann. § 33-3-1 (1972) expressly provides that the governor, as commander in chief, shall have the power "to call forth the militia, to execute the laws, repel invasion, and suppress riots and insurrections, and to perform other such functions as may be authorized by law." This Court concludes that, contrary to Defendant's assertions, Mississippi law specifically provides that all powers of the commander in chief must be expressly provided for by law. Section 33-3-1, by its plain language, clearly rebuts the suggestion that the position of commander in chief is one of implied powers. The Court further notes that section 33-3-1 clearly expresses the legislative mandate that the position of commander in chief is not one of inherent authority, but rather one of express granted powers. The Mississippi legislature, by virtue of its statutory enactments, has clearly established that certain powers are to be exercised by the commander in chief and certain powers are to be exercised by the adjutant general. Any theory of implied powers would be contrary to the statutory scheme that the legislative representatives of that state have enacted.

This Court finds support for its conclusion that Defendant does not have the inherent power as commander in chief to remove Plaintiff's authority as adjutant general in cases from other jurisdictions that have considered attempts to remove the adjutant general from office. In *McDonald v. Schnipke*, 380 Mich. 14, 155 N.W.2d 169 (Mich.1968), the court entertained a quo warranto proceeding to determine Plaintiff's right to hold the office of state adjutant general where he had been appointed, summarily removed, reinstated, and immediately suspended from acting in that capacity. Plaintiff argued that, because state law provided a specific procedure by which he could be removed from office as adjutant general and that procedure had not been followed, the attempt to remove him from office or otherwise deny him the authority of that position was void. In holding that Plaintiff did have a right to hold his duly appointed office until he had been removed from office in accordance with state law, the court specifically rejected the contention that the governor, as commander-in-chief, had the inherent authority to remove military officers from office. *McDonald*, 155 N.W.2d at 172. Noting that, under state law and state constitutional provisions, the governor was granted the express power as commander in chief to call out the armed forces of the state, the court concluded that it could not read into that express grant of authority any implied authority of the commander in chief to remove or otherwise discipline officers of the militia. *Id.* Likewise, in *State ex rel. Pearson v. Hansen*, 401 P.2d 954 (Wyo.1965), the court concluded that a governor had improperly removed a state adjutant general from office where the attempted removal was undertaken pursuant to the governor's general powers as commander in chief rather than the specific statutory provisions dealing with the removal of an adjutant general from office. *Pearson*, 401 P.2d at 960.

■ Having determined that no implied powers of the commander in chief exist which could serve as authority for Defendant's conduct in this matter, the Court now considers whether, as required by section 33-3-1, Defendant has been "authorized by state law" to assume the duties of the adjutant general and direct the daily operations of the Mississippi National Guard. This Court can find no such authorization. To the contrary, this Court notes

Miss.Code Ann. § 33–7–5 (1972), which provides

> The commander in chief of the organized militia of this state may cause those officers under his command to perform any military duty, and they shall be responsible to the governor for the general efficiency of the organized militia and for the inspection, training, training, instruction, military proficiency, and care of the troops.

By its express terms, section 33–7–5 provides that the commander in chief may order his subordinate officers to perform any military duty, yet the subordinate officer himself is responsible to the commander in chief to ensure that the duty has been performed. This construction of state law simply does not support Defendant's contention that, as commander in chief, he has the legal authority to directly assume the performance of those duties himself.

The Court also finds instructive other statutes dealing with the scope of command authority that the commander in chief may wield when his powers to declare martial law have been exercised. Miss. Code Ann. § 33–7–305 (1972) provides:

> It shall be the duty of the governor, when ordering out any portion of the national guard, for active state duty, to issue his orders to the officer in command of such troops as he may have ordered out, directing him as to the duty to be performed and the kind and extent of force to be used in the performance of such duty.... The tactical direction of the troops, the kind and extent of the force to be used, and the particular means to be employed are left solely with the military officers, subject to the orders received from the commander in chief.

Because section 33–7–305 expressly deals with the declaration of martial law and the powers of the commander in chief under such circumstances, the Court finds that it has no direct application to the facts of the instant case, since Defendant has never purported to act pursuant to a declaration of martial law. The Court does find, however, that the policies embodied by section 33–7–305 are instructive. Even when the governor is acting pursuant to a declaration of martial law, the scope of orders that he may direct to his subordinate officers is limited, and the commander in chief is not given the authority to directly intervene in matters of military tactics and operations. More importantly, however, the governor is specifically required to act through his subordinate officers and may not assume direct operational control of the Mississippi National Guard. If the governor, acting pursuant to the most authoritative powers he has under a declaration of martial law, cannot assume direct operational control of the Mississippi National Guard, the Court must conclude that the governor cannot assume direct operational control of the Mississippi National Guard under less crucial circumstances.

Finally, this Court notes that the limited nature of the governor's authority to direct the day-to-day affairs of the national guard is further strengthened by the fact that the State of Mississippi has insulated the adjutant general from such interference by allowing his removal from office, not by act of the governor, but only through the impeachment process before the state senate.

Based upon the foregoing analysis, this Court concludes that Plaintiff has a "legitimate claim of entitlement" to his position as adjutant general of the Mississippi National Guard and, therefore, has established a protected property right within the meaning the fourteenth amendment due process clause. The Court further finds that the substantive content of that property right, as defined by state law, includes those absolute powers and authority which state law has exclusively granted to the adjutant general and which the adjutant general is empowered to exercise without the supervision or interference of the commander in chief. Further, the Court finds that Plaintiff has established a property right in those powers and duties which state law grants to the adjutant general, but for which gubernatorial oversight of the adjutant general's activities are provided. With regard to these powers and duties, the Court concludes that Plaintiff's property right extends only to his right to undertake these activities subject to the approval of the commander in chief.

### (b) deprivation of a property right

 Having determined the extent of Plaintiff's constitutionally protected property right in his authority as adjutant general, the Court must now consider whether Plaintiff has been deprived of his property right without the procedural due process protections to which he is entitled. Defendant initially asserts that Plaintiff has not been deprived of his property rights in violation of the due process clause because there has been no actual removal of Plaintiff from the office of adjutant general. Because Plaintiff still retains his office of command and has, in Defendant's terms, merely been "subordinated" to the authority of his commander in chief, Defendant asserts that no actual deprivation of Plaintiff's command has occurred. The Court finds this argument spurious, at best. Though Plaintiff may not technically be deprived of his command, in that he retains the title of adjutant general, the Court notes that Plaintiff has been effectively deprived of the ability to perform any single action in his capacity as adjutant general. The distinction that Defendant attempts to draw between deprivation of the title of adjutant general and deprivation of the ability to act as the adjutant general seems slim indeed when viewed in this light. The Court has previously concluded that certain of the duties and powers conferred upon the adjutant general are conferred upon him exclusively and are ·not subject to oversight or review by the commander in chief. Plaintiff is currently prohibited from exercising those exclusive powers. Accordingly, the Court conclude that Plaintiff has in fact suffered a deprivation of rights which he is entitled to exercise.

As this Court has noted, Plaintiff is currently suspended from his position as adjutant general with pay. Defendant cites the case of *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), for the proposition that an employer may, consistent with the requirements of fourteenth amendment due process, suspend with pay any employee who would be deemed to create a "significant hazard" if allowed to continue in active employment while pretermination procedures were under way. This Court finds, however, that Defendant's reliance on *Loudermill* is misplaced. While the *Loudermill* Court did note that suspension with pay might be an appropriate procedural protection in some instances, the Court specifically found that it was not applicable under the facts of that case. *Loudermill*, 470 U.S. at 544–45 n. 10, 105 S.Ct. at 1495 n. 10. Likewise, this Court finds that the facts of the instant case do not to suggest a "significant hazard" of such proportions that Plaintiff's due process rights could be satisfied by suspending him with pay in lieu of his rights to pretermination process. In addition to the "significant hazard" exception relied upon by Defendant, this Court notes that *Loudermill* strongly reaffirmed the basic principles of due process protections that require appropriate procedural safeguards to be utilized before the deprivation of a protected interest can occur.

> The essential requirements of due process ... are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement.... The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.

*Id.* at 546, 105 S.Ct. at 1495 (citations omitted). Accordingly, the Courts concludes that suspension with pay does not constitute an appropriate procedural protection in this case.

Defendant next asserts that appropriate procedural protections have been observed in this matter because, in addition to the provisions of Article 9, section 216 of the Mississippi Constitution dealing with the removal of the adjutant general from office, state law also provides for the suspension of any general military officer. Defendant, however, has not informed this Court of any state statute or other legal enactment that serves as the basis of this assertion. Contrary to Defendant's assertions, however, this Court notes that the Mississippi Code of Military Justice prohib-

its an individual who is the subject of a court-martial proceeding from being punished prior to the termination of that proceeding.

> No person, while being held for trial [by a court-martial proceeding] or the result of trial, may be subjected to punishment or penalty other than arrest or confinement upon the charges pending against him, ... nor can the arrest or confinement imposed upon him be any more rigorous than the circumstances require to ensure his presence.

Miss.Code Ann. § 33–13–27 (1972). The Court therefore finds that suspension of Plaintiff pending the resolution of the court martial proceeding is not lawful under this provision of the Military Code. The Court also finds that, to the extent Defendant's suspension of Plaintiff can be viewed as nonjudicial punishment by a commanding officer, Miss.Code Ann. § 33–13–31 (1972) specifically provides that suspension from duty by order of the governor cannot exceed sixty days. Consequently, the Court finds that Plaintiff's suspension is without merit under state law on the basis of this provision as well.

In summary, this Court concludes that Plaintiff has established that he holds a property interest in his position and authority as adjutant general that is protected under the due process clause of the fourteenth amendment. This Court further finds that Defendant has deprived Plaintiff of that property interest without the procedural protections to which Plaintiff is constitutionally entitled. Accordingly, the Court concludes that Defendant has violated Plaintiff's due process rights as guaranteed by the fourteenth amendment to the United States Constitution.

### (4) Federal Statutory and Regulatory Claims

The Court now considers Plaintiff's remaining substantive claim, namely that Defendant has deprived Plaintiff of his federally derived authority as adjutant general in violation of certain federal statutory and regulatory provisions as well as the fourteenth amendment to the United States Constitution.

The Court initially addresses Defendant's contention that deference should be given to certain pronouncements by the National Guard Bureau that indicate that the Bureau did not consider Defendant's actions to be in violation of any federal statute or regulation pertaining to the National Guard. Specifically, Defendant notes the February 12, 1990, letter by the Chief of the National Guard Bureau indicating that Defendant's order that Plaintiff clear all of his proposed actions as adjutant general before undertaking to act "[w]as within the authority of the Governor, as Commander-in-Chief, of the Mississippi National Guard." In addition, Defendant notes that the March 5, 1990, order to Plaintiff directing him to delegate certain of his federal duties and powers was undertaken pursuant to proposed draft orders that had been forwarded by the National Guard Bureau to Defendant. Because these occurrences indicate that the federal bureau charged with the responsibility of overseeing compliance with federal regulations did not view Defendant's actions as unlawful, Defendant asserts that this Court should defer to that agency's interpretation of its own regulations and laws.

It is true that a federal agency may enjoy deference from the court with regard to that agency's actions in administering the program it is entrusted to conduct. *See, e.g., Richardson v. Wright*, 405 U.S. 208, 209, 92 S.Ct. 788, 789, 31 L.Ed.2d 151 (1972). The Court, however, does not find this to be the critical inquiry in the instant matter. Both communications of the National Guard Bureau at issue are implicitly premised upon the Bureau's determination that Defendant was acting within the authority that had been conferred upon him pursuant to state law as commander in chief. A federal agency's determination of state law does not fall within the scope of judicial deference that Defendant urges. Accordingly, this Court concludes that no particular deference should be accorded to the National Guard Bureau's opinion that Defendant was acting within his powers as commander in chief.

■ The Court also concludes that judicial deference is not warranted under these circumstances because the ultimate issues presented by this matter are of constitutional dimension. The opinions expressed by the National Guard Bureau, while facially dealing with issues of compliance with federal regulations, ultimately involve questions of who had the legal right to exercise the authority conferred upon the adjutant general. That issue is the basis of Plaintiff's due process challenge in this case. Where a dispute concerns constitutional issues, the court should interpret the constitutional provisions without yielding to an administrative interpretation. *Barlow v. Collins*, 397 U.S. 159, 166, 90 S.Ct. 832, 837–38, 25 L.Ed.2d 192 (1970). Accordingly, the Court concludes that no particular deference should by accorded National Guard Bureau opinions on this basis as well.

■ As this Court has previously noted, federal statutes specify certain federal duties that are to be carried out by the duly appointed adjutant general of each state. *See, infra,* section I. The adjutant general is given additional federal duties pursuant to federal regulation of the National Guard. *See, infra,* note 2. Plaintiff contends that, because these duties are specifically directed to the adjutant general and he has not been removed from that position by a legal exercise of authority, he remains authorized and, indeed, compelled to perform those duties. This Court agrees. As the Court has already determined, Plaintiff has established a right to exercise all duties and authority bestowed upon the adjutant general until such time as he is removed from office pursuant to the requirements of state law and fourteenth amendment due process. This Court has additionally determined that, until the time that such a removal is accomplished, Plaintiff has the prerogative to exercise all those rights and authority conferred upon him by state law that constitute Plaintiff's protected property interest. This Court can discern no basis for denying Plaintiff the same rights with regard to the duties that have been conferred upon him by federal law. *See Goldberg v. Kelly*, 397 U.S. 254, 262, 90 S.Ct. 1011, 1017, 25 L.Ed.2d

287 (1970) (noting that due process protection may attach to benefits statutorily created under federal law). Accordingly, the Court concludes that, to the extent that federal statutes and regulations confer upon Plaintiff certain authority and duties pursuant to his position as state adjutant general and Plaintiff has not been legally removed from that position of authority, fourteenth amendment due process protections attach to all such federally created property interests. Consequently, Defendant has violated Plaintiff's due process rights by prohibiting Plaintiff from exercising his federally conferred authority while he still legally remains the state adjutant general.

## III. CONCLUSION

Having concluded that Defendant violated Plaintiff's due process rights as guaranteed by the fourteenth amendment to the United States Constitution when Defendant stripped Plaintiff of his authority as adjutant general of the Mississippi National Guard without securing Plaintiff's removal from that office in compliance with the requirements of state law, the Court finds that no genuine issue of material fact exists as to this count of Plaintiff's complaint and that summary judgment should be granted in favor of Plaintiff as a matter of law. The Court further finds that no genuine issue of material fact exists as to that count of Plaintiff's complaint alleging that Defendant has deprived Plaintiff of his federally derived authority as adjutant general in violation of federal statutory and regulatory provisions. Therefore, the Court finds that, as a matter of law, summary judgment should be granted in favor of Plaintiff on that count of the complaint as well. Based on the findings noted above, this Court determines that injunctive relief should be ordered in favor of Plaintiff and that Defendant should be enjoined from impeding, interfering with, or otherwise disrupting Plaintiff's performance of those duties, powers, and authority of the adjutant general in which Plaintiff has demonstrated a property interest. Specifically, this Court finds that, with regard to those specific statutory and regulatory enact-

ments which exclusively vest in the adjutant general the absolute authority to undertake certain powers, duties, or authority, Defendant should be enjoined from impeding, interfering with, or otherwise disrupting in any way Plaintiff's performance of such activities. Additionally, the Court finds that, to the extent that Plaintiff has established a property right in certain duties, powers, and authority which he may exercise only with the approval or supervision of Defendant, Defendant is enjoined from prohibiting Plaintiff's performance of such activities, but Defendant may still exercise the full range of discretion and supervision with regard to Plaintiff's discharge of those activities. Finally, the Court concludes that the injunctive relief issued in this case shall remain in force and effect until such time as Plaintiff is removed from the office of adjutant general as provided under Mississippi law or his term of office otherwise expires. Since these rulings are declaratory in nature, Plaintiff's request for a declaratory judgment is granted in addition to injunctive relief.

The Court notes that its ruling does not imply that Plaintiff is not required to obey the lawfully issued orders of his commander in chief. In addition, the Court notes that today's ruling does not consider, or in any way condone, Plaintiff's activity that is the underlying dispute in this matter.

Finally, the Court notes that it considers the entire matter presented by this lawsuit to be a disservice to the Mississippi National Guard, a military organization with a proud heritage of preparedness and ready service in the defense of this state and our nation. International events that have developed since the institution of this lawsuit and the important role that the Mississippi National Guard has played in those events underscore to this Court the importance and necessity of removing petty personal grievances and political dog fighting from the command structure of that organization. This incident has served not only as an embarrassment to the State of Mississippi and the Mississippi National Guard, but has shown command indifference to the dignity with which guardsmen serve their state and nation. Had General Farmer had

the true interests of the military and the men under his command in mind, this Court concludes that he would have taken a path different from the one chosen. While Governor Mabus may feel in hindsight that he exercised poor judgment in appointing Farmer to the office of adjutant general, he exercised even worse judgment in the way that he has chosen to handle this matter. If General Farmer has not satisfactorily performed his duties, the governor should have lawfully sought Farmers' court-martial or impeachment. Such has not been the case. This Court can only hope that today's ruling will emphasize to all parties involved in this lawsuit the degree of competence and professionalism that the public rightfully expects, and guardsmen rightfully deserve, in the command of the Mississippi National Guard.

IT IS THEREFORE ORDERED that Defendant is hereby enjoined from impeding, interfering with, or otherwise disrupting Plaintiff's performance of all absolute duties, authority, and powers conferred by state or federal law upon him as the adjutant general of the Mississippi National Guard.

IT IS FURTHER ORDERED that Defendant is hereby enjoined form prohibiting Plaintiff's performance of certain duties, powers, and authority which Plaintiff is authorized to perform with Defendant's supervision and oversight, provided, however, that Defendant may still exercise the full range of discretion and supervision with regard to Plaintiff's discharge of these activities.

IT IS FURTHER ORDERED that the injunction hereby ordered of Defendant's conduct shall become effective immediately and shall remain in force and effect until such time as Plaintiff is removed from the office of adjutant general as provided under the laws of Mississippi or otherwise no longer occupies that office.

IT IS FURTHER ORDERED that, pursuant to the Court's decision in this Memorandum Opinion and Order, a separate Declaratory Judgment and Order for Injunctive Relief will be entered in this case to

guide the parties in carrying out this Court's Order.

SO ORDERED.